**Jim and Roxanne SANDT, Appellants**

v.

**ENERGY MAINTENANCE SERVICES GROUP I, LLC n/k/a Energy Maintenance Services Group I, Inc., Appellee**

and

**Energy Maintenance Services Group I, LLC n/k/a Energy Maintenance Services Group I, Inc., Appellant**

v.

**Timothy Nesler, Appellee**

**NO. 01-15-01070-CV, NO. 01-16-00362-CV**

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued July 27, 2017

Rehearing Denied August 22, 2017

---

Lloyd E. Kelley, THE KELLEY LAW FIRM, 2726 Bissonnet, Suite 240, PMB 12, Houston, TX 77005, for Appellants.

Timothy F. Lee, Michelle R. Meriam, WARE, JACKSON, LEE, O'NEILL, SMITH & BARROW, LLP, 2929 Allen Parkway, 39th Floor, Houston, TX 77019, for Appellee.

Panel consists of Chief Justice Radack and Justices Jennings and Bland

## OPINION

Jane Bland, Justice

These companion cases arise from efforts to enforce a judgment against an executive officer and his company. We interpret the provisions of two agreements—the company's agreement to indemnify the officer, and the company's later settlement agreement with the plaintiff in the underlying case—to determine whether the company must indemnify the officer for the judgment against him and whether the settlement released the plaintiff's collection of that judgment if the company is obligated to pay it. We conclude that the company owes indemnity to the officer and, because the company is obligated to indemnify its officer, the settlement agreement precludes further collection of the judgment. Because the trial court similarly ruled, we affirm its judgment.

## BACKGROUND

### The officer/shareholder litigation

Jim Sandt was a former officer and shareholder of Energy Maintenance Services Group I, LLC, a closely held Delaware limited liability company. Timothy Nesler was the chief executive officer of Energy Maintenance. In 2005, Sandt sued Energy Maintenance and Nesler, among other officers of the company. The gravamen of Sandt's suit was that Energy Maintenance, Nesler, and the other officers wrongfully had diluted Sandt's ownership interest in Energy Maintenance, committing fraud and breach of fiduciary duty.

### Nesler receives indemnification for the Sandt lawsuit

In August 2007, while Sandt's suit was pending, Energy Maintenance's board of directors agreed to indemnify Nesler for any liability arising out of or relating to the *Sandt* litigation. The board memorialized that agreement in a company resolution:

[It is] FURTHER RESOLVED, that the Company shall indemnify Mr. Nesler . . . . in full against all damages, claims, judgments, fines and costs, including costs of defense, investigation and settlement and the cost of separate counsel, if any, together with all other expenses and damages of any kind, including punitive damages, if any, as and when incurred . . . which arise out of or are related in any way to the Sandt litigation . . . .

The board's resolution states that it agreed to indemnify Nesler after reviewing the *Sandt* litigation and discussing the facts and circumstances of it with the company's officers and attorneys. The resolution further recites that, as required by the limited liability company agreement as a precondition to indemnification, the board determined that Nesler had acted in good faith and in a manner that he reasonably believed was in, and not opposed to, Energy Maintenance's best interests:

[It is] FURTHER RESOLVED, that pursuant to Section 8.3 of the Company's LLC Agreement, and with respect to the events that are the subject of the Sandt litigation, the Board has determined that indemnification of Mr. Nesler is proper under the circumstances because he has met the standard of conduct set forth in Section 8.1 of the LLC agreement . . . .

### Sandt wins the lawsuit

The *Sandt* lawsuit went to trial in June 2009, about two years after the board had agreed to indemnify Nesler. A Fort Bend County jury found in favor of Sandt and against both Energy Maintenance and Nesler. The jury found that Nesler had breached his fiduciary duty to Sandt by diluting Sandt's interest in the company. It

further found that Energy Maintenance and Nesler had committed statutory fraud against Sandt. Based on these and other findings, the trial court entered judgment in Sandt's favor in July 2009. The judgment awarded $780,000 in damages and attorney's fees to Sandt from Energy Maintenance, Nesler, and two other officers, jointly and severally. In addition, the judgment awarded Sandt $300,000 in punitive damages against Energy Maintenance and Nesler individually.

The defendants in the *Sandt* case appealed the judgment. While the appeal was pending, Energy Maintenance's primary creditor took control of the company and fired Nesler from his position as chief executive officer.

### The board attempts to revoke its indemnity agreement

In September 2011, a new board of directors voted by written consent to "revoke" the indemnification that the board had authorized in August 2007 "effective as of the date indemnification was purportedly granted." In support of its revocation, the board passed a resolution stating that its "investigation to date indicates that Mr. Nesler misrepresented to the Board the facts, circumstances and status of the Sandt Matter." The new board further stated:

> [I]nvestigation to date indicates that it may have been inappropriate for the Board to purport to agree to indemnify Mr. Nesler from all liability, regardless of the basis therefor and apparently with no exclusions or exceptions. . . .

### The company settles the Sandt litigation

In March 2012, the Fourteenth Court of Appeals affirmed Sandt's judgment against Energy Maintenance and Nesler. *See Energy Maint. Servs. Grp. I, LLC v. Sandt,* 401 S.W.3d 204, 223 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

Energy Maintenance and the defendant officers petitioned for review to the Texas Supreme Court. In October 2012, while their petition was pending, Energy Maintenance settled with Sandt, as did the other company officers, save Nesler. The settlements resolved all liability other than the $300,000 exemplary-damages award assessed against Nesler individually. The settlement agreement between Energy Maintenance and Sandt expressly provided that Sandt would not seek recovery of the $300,000 owed by Nesler from Energy Maintenance, either "directly or indirectly."

Nesler alone continued to pursue appellate review of the judgment. The Texas Supreme Court denied his petition.

### Nesler seeks indemnity from the company

After the Court denied review in the *Sandt* case, Nesler sought indemnity from Energy Maintenance. Energy Maintenance refused to provide it and filed this suit against Nesler in April 2013, seeking a declaration that it did not owe him indemnity. Energy Maintenance contended that the jury's findings of fraud and breach of fiduciary duty against Nesler in the *Sandt* litigation alleviated the company's indemnification obligation, and it asserted that revocation of its agreement to indemnify Nesler was proper because Nesler had misled the board of directors about the *Sandt* litigation. Nesler counterclaimed for breach of contract, seeking indemnity and his attorney's fees.

### The company sues to enforce the Sandt settlement

Energy Maintenance also sued Sandt. It requested the trial court to construe the settlement agreement between Energy

Maintenance and Sandt and declare that, based on their agreement, Sandt was not owed the $300,000 Nesler judgment if Energy Maintenance was obligated to indemnify Nesler.

Energy Maintenance and Nesler moved for summary judgment. The trial court denied Energy Maintenance's motion and granted Nesler's motion in part, ruling that Nesler was entitled to indemnity based on the board's August 2007 indemnity resolution, and that Energy Maintenance's failure to indemnify Nesler was a breach of that agreement.

Energy Maintenance subsequently amended its pleadings to add additional claims against both Sandt and Nesler. Energy Maintenance sued Sandt for breach of the parties' settlement agreement, alleging that Sandt's attempts to collect the $300,000 from Nesler breached the settlement agreement. Energy Maintenance sued Nesler for breach of fiduciary duty and fraud. Energy Maintenance alleged that Nesler breached his fiduciary duty to the company by engaging in self-dealing when he diluted Sandt's ownership interest in December 2003 and when he obtained indemnity from the board of directors by misleading it in August 2007. Energy Maintenance alleged that Nesler committed fraud by concealing the nature of Sandt's allegations and the extent of his misconduct from the board when he sought indemnity.

### The trial court's rulings

Nesler responded to Energy Maintenance's new claims against him by pleading the statute of limitations as an affirmative defense and moving for summary judgment on that ground. Energy Maintenance replied and asserted the discovery rule, alleging that it did not discover Nesler's wrongdoing until the company fired him in 2011. The trial court granted Nesler's summary-judgment motion, ruling that Energy Maintenance's fiduciary duty and fraud claims were barred by the applicable four-year statute of limitations.

The trial court then submitted the issue of damages for Nesler's claim for indemnity to a jury. The jury found that Nesler was entitled to recover $164,092.18 for attorney's fees incurred as a result of Energy Maintenance's failure to indemnify him in connection with Sandt's lawsuit. It further found that Nesler was entitled to recover $537,418.35 in attorney's fees incurred in this litigation. The trial court signed a judgment incorporating the jury's verdict and its separate orders on Energy Maintenance's fiduciary duty and fraud claims.

The parties tried to the bench Energy Maintenance's claim against Sandt for breach of the settlement agreement. The trial court found in favor of Sandt on that claim, and it awarded Sandt $15,000 in attorney's fees.

The trial court then signed a final judgment consistent with its interlocutory judgments. The final judgment, however, also included a declaration that any further attempt by Sandt to collect the $300,000 award against Nesler remaining from the *Sandt* litigation would breach the settlement agreement's clause barring indirect recovery from Energy Maintenance; because Energy Maintenance owed Nesler indemnity for the *Sandt* litigation.

Energy Maintenance appeals from the final judgment, contending that the trial court erred in ruling that Energy Maintenance is obligated to indemnify Nesler and that Energy Maintenance's fiduciary duty and fraud claims are barred by limitations. Sandt also appeals, contending that the trial court erred in declaring that Sandt's settlement agreement with Energy Main-

tenance bars him from collecting the remaining judgment against Nesler.

## DISCUSSION

### I. Indemnification

Energy Maintenance contends that the trial court erred in holding that it is obligated to indemnify Nesler for amounts arising from the *Sandt* litigation. It reasons that the company's limited liability agreement permits indemnification of officers only for acts taken in good faith and in a manner reasonably believed to be in, or unopposed to, the company's best interests. Despite the board's determination that those conditions were met when it granted indemnity to Nesler in 2007, Energy Maintenance maintains that the judgment against Nesler for breach of fiduciary duty and fraud conclusively negates Nesler's good faith.

Nesler responds that Energy Maintenance's board of directors authorized indemnity after making its determination that Nesler had acted in good faith and in the company's best interests, and the jury's later findings do not trump the board's determination for purposes of conferring indemnity under the company's established governance agreement for determining indemnification. Nesler further responds that the board's determination was made with the advice of counsel and knowing that allegations of fraud and breach of fiduciary duty had been made in the *Sandt* lawsuit. Finally, Nesler responds that the board's 2007 determination is dispositive of the indemnity question under the company's governance agreement, which does not provide for unilateral revocation of its indemnity obligation.

### A. Standard of review

 We review a trial court's summary judgment order de novo. *Mann*

*Frankfort Stein & Lipp Advisors v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). When, as here, both sides moved for summary judgment and the trial court granted one motion and denied the other, we review the summary-judgment evidence and decide all questions presented. *Id.* The interpretation of an unambiguous contractual provision for indemnity is a question of law, which we also review de novo. *Crowder v. Scheirman*, 186 S.W.3d 116, 119 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

### B. Delaware limited liability company law

 Energy Maintenance is a limited liability company formed under Delaware law; thus, Delaware law controls the interpretation of the company's formation agreement. 6 DEL. CODE § 18-1101(i); *Strebel v. Wimberly*, 371 S.W.3d 267, 276 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). Under Delaware law, a limited liability company may indemnify any member, manager, or another "against any and all claims and demands whatsoever," subject to whatever standards or restrictions are included in its company agreement. 6 DEL. CODE § 18-108. For limited liability companies, Delaware law "defers completely to the contracting parties to create and delimit rights and obligations with respect to indemnification." *Majkowski v. Am. Imaging Mgmt. Servs.*, 913 A.2d 572, 591 (Del. Ch. 2006).

 Accordingly, it is the express policy of Delaware's limited liability company statute "to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." 6 DEL. CODE § 18-1101(b). A member's rights begin and end with the company agreement; once the agreement is executed, a member "can be virtually

certain that the agreement will be enforced in accordance with its terms." *Walker v. Res. Dev. Co.*, 791 A.2d 799, 813 (Del. Ch. 2000). This generally means "that only where the agreement is inconsistent with mandatory statutory provisions will the members' agreement be invalidated." *Elf Atochem N. Am. v. Jaffari*, 727 A.2d 286, 292 (Del. 1999).

■ When interpreting the provisions of a limited liability company agreement, ordinary contract interpretation rules apply; the court's role is to effect the parties' intent based on the plain meaning of the agreement's terms. *Zimmerman v. Crothall*, 62 A.3d 676, 690–91 (Del. Ch. 2013); *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Holding Co.*, 853 A.2d 124, 127 (Del. Ch. 2004).

■ Under Delaware law, contracts "should be read as a whole, with terms given their plain, ordinary, and generally accepted meaning, and with each term given effect so as not to render recitations meaningless or mere surplusage." *Strebel*, 371 S.W.3d at 277. Words used by the parties in a technical sense or which have become terms of art through routine usage in a particular context should be construed consistent with that usage. *See Majkowski*, 913 A.2d at 588–89 (interpreting phrase "indemnify and hold harmless" in accord with its well-established legal meaning). A court cannot rewrite or add omitted provisions in the guise of interpreting a contract. *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998).

## C. The board's indemnity agreement was enforceable.

■ With its passage of the resolution in 2007, the board obligated the company to indemnify Nesler for the *Sandt* litigation under the company's limited liability company agreement. Article VIII of the company agreement contains provisions for the advancement of litigation expenses and indemnification of company members. Section 8.6 obligates the company to advance a member's litigation expenses before the final disposition of a lawsuit. Section 8.1 obligates the company to indemnify a member in connection with threatened, pending, or completed civil suits if the member acted in good faith and in a manner reasonably believed to be in or unopposed to the company's best interests. Sections 8.1 and 8.3 vest the board of directors with the power to determine whether this good-faith standard is met.

Good faith is not defined by the company agreement, but Section 8.4 provides that a member or director shall be deemed to have acted in good faith if his actions were based on:

- the company's records or books;
- information supplied by the company's representatives;
- advice of the company's legal counsel; or
- information or records given or reports made to the company by an independent certified public accountant, appraiser, or other expert.

The board's discretion to find that the good-faith standard is satisfied is not confined to these instances; Section 8.4 provides that their enumeration does not limit the circumstances under which the board may decide that the standard is met.

Section 8.3 provides that if the member or director is successful on the merits or otherwise successfully defends against the suit, he is entitled to indemnity without the need for board authorization. Defeat, however, does not foreclose indemnification. Section 8.1 provides that the termination of the suit by judgment or settlement does not create a presumption that a member

failed to act in good faith. Even a criminal conviction does not create an adverse presumption such that the board must find bad faith. Rather, Section 8.7 elaborates that it is Energy Maintenance's policy to indemnify its members and directors to the fullest extent permitted by law.

Once the board has granted indemnity for the expenses associated with any litigation and judgment, the agreement does not provide for the later revocation of that indemnity. Section 8.10 specifies that any advancement of expenses or indemnification granted by the board shall continue even after the person has ceased to be a member or director, unless the board provided otherwise when it initially authorized or ratified the advancement or indemnity.

Despite the company agreement that vests the board with the authority to determine whether the conditions for authorizing indemnification have been met, Energy Maintenance contends that the jury's unfavorable verdict and the judgment against Nesler for fraud disproved his good faith and thereby provided a basis for the board to revoke its earlier grant of indemnity. The company relies on Delaware decisions construing that state's corporate indemnification statute, 8 DEL. CODE § 145, for the proposition that a jury's finding of fraud negates good faith as a matter of public policy. *See Hermelin v. K–V Pharm. Co.*, 54 A.3d 1093, 1112 (Del. Ch. 2012); *Sun–Times Media Grp. v. Black*, 954 A.2d 380, 404 n.93 (Del. Ch. 2008). It argues that these decisions are apt by analogy because the company agreement's language is materially similar to the language of Section 145.

But the statutes governing Delaware corporations and Delaware limited liability companies are different. Unlike Section 145, which applies to corporations, the statute governing limited liability companies allows indemnity "against any and all claims and demands whatsoever," subject only to the express terms of the company agreement. 6 DEL. CODE § 18-108. This statute does not purport to adopt or incorporate Delaware's public policy regarding indemnity in the corporate context, and instead defers to the contracting parties to place limits on indemnification. *See Majkowski*, 913 A.2d at 591.

Turning to Energy Maintenance's company agreement, its terms contemplate indemnification in the event that a jury finds that a member's or director's acts were not made in good faith. Though the company agreement obligates Energy Maintenance to indemnify members and directors who acted in good faith, it vests the board with the authority to decide if they did so. The agreement expressly specifies that an adverse judgment does not create a presumption of bad faith, and states a company policy of indemnifying corporate officers to the fullest extent legally possible. Energy Maintenance's company agreement does not, in express and affirmative terms, make members and directors ineligible for indemnification previously granted simply because a jury finds that they did not act in good faith, and we cannot rewrite its company agreement to say something it does not. *See Cincinnati SMSA*, 708 A.2d at 992; *see also Senior Tour Players*, 853 A.2d at 130 (declining to read provision regarding advancements into company agreement where agreement was silent on topic). The agreement provides the board with the option of advancing the costs of litigation and leaving the indemnification question for a later time. As Energy Maintenance's later board acknowledged, however, the 2007 resolution was one that obligated the company to indemnify its officers in the *Sandt* suit, not one that merely advanced the officers' litigation expenses.

## D. Delaware public policy does not nullify the indemnity agreement.

 Even if Delaware's public policy concerning corporate indemnity applied to limited liability companies, the decisions that Energy Maintenance relies on like *Hermelin* and *Sun–Times* are not analogous to the defense against indemnification that it asserts in this case. *See Hermelin,* 54 A.3d 1093; *Sun–Times,* 954 A.2d 380. In *Hermelin,* a former officer sued to compel the company to indemnify him after it refused his indemnity request. 54 A.3d at 1095. In *Sun–Times,* the company sought a declaratory ruling that it was not obligated to continue advancing litigation expenses to several former officers after they had been convicted and sentenced in a criminal matter. 954 A.2d at 383. Neither decision involved facts like the present case, in which the board agreed to indemnify an officer, indemnified him through trial, and then proposed to revoke that indemnity retroactively while an adverse verdict was on appeal.

Energy Maintenance has not identified any decision in which a Delaware court upheld a Delaware corporation's decision to rescind an agreement to indemnify one of its officers or directors after an adverse jury decision. Delaware law is to the contrary, providing that an indemnified person's continued service to the firm provides the consideration necessary to form a binding contractual agreement. *Marino v. Patriot Rail Co.,* 131 A.3d 325, 341 (Del. Ch. 2016). This general principle of contract is equally applicable to limited liability companies, like Energy Maintenance. Accordingly, unless Energy Maintenance had a contractual right to reconsider its decision to indemnify Nesler, it could not do so. Neither its company agreement nor the board's 2007 indemnity resolution reserved a right to revisit Nesler's right to indemnity. Energy Maintenance therefore could not rescind its agreement to indemnify him. *See Marino,* 131 A.3d at 343–44 (corporate charter did not state that it could be amended to alter officer's advancement rights and corporation therefore could not do so after his service to the company).

## E. The board was authorized to indemnify Nesler.

 Energy Maintenance next contends that its previous board of directors lacked the authority to indemnify Nesler when it did so in 2007. In support of this position, the company relies on cases in which Delaware courts refused to require companies to indemnify corporate officers at the outset of litigation, observing that a corporate officer's "right to indemnification is a decision that must necessarily await the outcome of the investigation or litigation." *Kaung v. Cole Nat'l Corp.,* 884 A.2d 500, 509 (Del. 2005); *see also Marino,* 131 A.2d at 346; *Paolino v. Mace Sec. Int'l,* 985 A.2d 392, 397 (Del. Ch. 2009). Likewise, the Court of Chancery has said that a limited liability company's officer's right to indemnity generally cannot be resolved until after the merits of the underlying lawsuit are decided. *See Majkowski,* 913 A.2d at 586.

These decisions, however, do not support Energy Maintenance's position that its board lacked authority to grant indemnity when it did. Rather, in each of these cases, the company and its former officer were at loggerheads regarding advancement or indemnity, and the court determined that a ruling enforcing an indemnity obligation at the outset of the litigation was premature. *See Kaung,* 884 A.2d at 502–05 (company and its former officer disputed fee advancement for class action and governmental investigation); *Marino,* 131 A.3d at 328–32 (company and former officer disputed fee advancement relating

to third party's post-judgment motion seeking to add officer as judgment debtor on judgment against company); *Paolino*, 985 A.2d at 394–96 (company and former officer disputed fee advancement and indemnity relating to counterclaims alleged by company in arbitration between company and former officer); *Majkowski*, 913 A.2d at 574–75 (company and former officer disputed fee advancement for suits between company's affiliates and former officer). In contrast, Energy Maintenance's board determined that Nesler had acted in good faith and agreed to indemnify him when he requested it. Section 8.1 of the agreement expressly permits indemnification with respect to a "threatened, pending, or completed action." Energy Maintenance's company agreement thus authorized its board of directors to indemnify Nesler at the outset of the *Sandt* suit, without regard to a jury's later finding of liability. *Kaung* and the other decisions involving a disputed request for advancement or indemnity do not provide a basis to avoid the board's decision to indemnify Nesler. We hold that Energy Maintenance's board had the authority to indemnify Nesler when it did.

## II. Limitations

Energy Maintenance next contends that the trial court erred in granting summary judgment on its claims for fraud and breach of fiduciary duty based on the four-year statute of limitations. Relying on the discovery rule and relation-back doctrine, Energy Maintenance asserts that its claims did not accrue until its board learned of Nesler's misconduct and that the board did not do so until 2011, less than four years before it initially filed suit in 2013. Nesler responds that Energy Maintenance's claims were not inherently undiscoverable or, alternatively, that the *Sandt* litigation put Energy Maintenance on notice of its potential claims against

him more than four years before the company filed suit.

## A. Standard of review and applicable law

■■■■■ We review de novo a summary judgment based on the affirmative defense of limitations. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Statutes of limitation generally are procedural in nature and thus governed by Texas law. *Hill v. Perel*, 923 S.W.2d 636, 639 (Tex. App.—Houston [1st Dist.] 1995, no writ). Under Texas law, fraud and breach of fiduciary duty are subject to a four-year statute of limitations. Tex. Civ. Prac. & Rem. Code § 16.004(a)(4)–(5).

■■■■■ The discovery rule operates as a "very limited exception" to limitations, deferring accrual in cases in which the plaintiff's injury was "both inherently undiscoverable and objectively verifiable." *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 929–30 (Tex. 2011). An injury is inherently undiscoverable if it is unlikely to be discovered within the limitations period "despite due diligence." *Id.* at 930. Whether an injury is inherently undiscoverable is legal question, which we decide on a categorical basis. *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006) (per curiam). In answering this question, we examine whether the type of injury, rather than the particular injury at issue, was discoverable. *Id.*; *Cosgrove v. Cade*, 468 S.W.3d 32, 36 (Tex. 2015). Our answer thus does not turn on whether or when the plaintiff actually discovered the particular injuries it alleges. *See Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 735 (Tex. 2001); *Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 122 (Tex. 2001). An injury is objectively verifiable when the facts on which liability is predicated can be proven by "direct, physical

evidence." *S.V. v. R.V.*, 933 S.W.2d 1, 7 (Tex. 1996).

Injuries arising from fraud or breach of fiduciary duty are generally considered inherently undiscoverable due to the deceit inherent in the former and the relationship of trust and confidence involved in the latter. *See Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997) (discovery rule applies "in cases of fraud and fraudulent concealment, and in other cases in which the nature of the injury incurred is inherently undiscoverable"); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996) ("nature of the injury is presumed to be inherently undiscoverable" in the fiduciary context). However, if the facts relating to the injury are readily available to the injured party, then the discovery rule does not apply. *See, e.g., BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 65–67 (Tex. 2011) (facts underlying fraud claim not inherently undiscoverable where relevant information was readily available to plaintiff from several sources, including public records); *Villarreal v. Wells Fargo Brokerage Servs.*, 315 S.W.3d 109, 119–21 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (discovery rule inapplicable even if fiduciary relationship existed between the parties where brokerage account statements put plaintiff on notice of risky nature of investment and account losses). While a company has no duty to inquire into the conduct of its officers or other fiduciaries, "when the fact of misconduct becomes apparent it can no longer be ignored, regardless of the nature of the relationship." *S.V.*, 933 S.W.2d at 8; *accord Valdez v. Hollenbeck*, 465 S.W.3d 217, 231 (Tex. 2015). Moreover, even "a person owed a fiduciary duty has some responsibility to ascertain when an injury occurs." *Computer Assocs.*, 918 S.W.2d at 456. Thus, companies cannot neglect "every precaution or investigation" in blind reliance on fiduciaries. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 580 (Tex. 1963). To the extent that Delaware's substantive law regarding limited liability companies is relevant to this aspect of our analysis, it is in accord. Under Delaware law, management has a fiduciary duty to monitor the activities of the company to ensure against wrongdoing by its agents that could result in liability. *See Beam ex rel. Martha Stewart Living Omnimedia v. Stewart*, 833 A.2d 961, 971 & nn.16–17 (Del. Ch. 2003).

The discovery rule is categorically inapplicable when the factual basis for a claim was disclosed in litigation in which the injured party participated; such claims are not inherently undiscoverable. *See Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 530–31 (Tex. 1997) (per curiam) (company's claim for pesticide contamination not inherently undiscoverable where company was sued by others for same claims). Even when the underlying factual basis for the claim is disputed or uncertain in the litigation, such allegations should prompt a reasonably diligent party to investigate their veracity. *See Isaacs v. Schleier*, 356 S.W.3d 548, 560–62 (Tex. App.—Texarkana 2011, pet. denied) (discovery rule inapplicable to legal malpractice claim that rested on fact of dual representation where dual representation had been alleged by another party in the prior suit); *see also Slusser v. Union Bankers Ins. Co.*, 72 S.W.3d 713, 718 (Tex. App.—Eastland 2002, no pet.) (underpayment of commissions not inherently undiscoverable even if employer-employee relationship was a fiduciary one where fellow officer informed plaintiff of possibility of underpayment years before suit).

**B. The company's tort claims accrued more than four years before it sued.**

Energy Maintenance filed suit against Nesler in April 2013. It sought a

declaration that it was not obligated to indemnify Nesler. Energy Maintenance later added claims for breach of fiduciary duty and fraud. With respect to the fiduciary duty claims, Energy Maintenance alleged that Nesler's dilution of Sandt's ownership interest in December 2003 and his solicitation of indemnity from the company under false pretenses in August 2007 constituted self-dealing that delayed the accrual under the statute of limitations. Energy Maintenance's fraud claims alleged that Nesler misrepresented to the company's board the extent and nature of his wrongdoing. Based on these allegations, Energy Maintenance invoked the discovery rule, asserting that it "did not discover the wrongdoing until Nesler was expelled" from the company in 2011.

In this case, the *Sandt* litigation, documented in a public lawsuit against the company, provided readily available facts demonstrating an injury. In that lawsuit, Sandt made the same dilution allegations against Nesler and Energy Maintenance that Energy Maintenance seeks to assert against Nesler as a breach of his fiduciary duty to the company. Sandt also alleged fraud and statutory fraud against Nesler and Energy Maintenance based on the same underlying facts. As a party to the *Sandt* lawsuit, Energy Maintenance does not dispute notice of the suit, but it contends that the suit did not trigger limitations on its claims against Nesler because he neither gave the board a copy of Sandt's petition nor informed the board that Sandt alleged fraud. In support of these contentions, Energy Maintenance introduced the deposition testimony of one its former directors, Kenneth Orlowski. In August 2007, the board was comprised of two inside directors, including Nesler, and four outside directors. Orlowski stated that the board made its August 2007 indemnity determination without investigation and indemnified Nesler in ignorance of the de-tails of the *Sandt* suit. Orlowski testified, "Embarrassing as it is, I relied on Mr. Nesler's description of what happened."

Orlowski's deposition testimony fails to raise a fact issue as to the application of the discovery rule because it does not refute the board's awareness (including a majority of outside directors) of the suit against the company; reasonable diligence required investigation into any claims arising from the *Sandt* litigation at that point. Because the company was a party to the case, allegations made in the *Sandt* litigation cannot qualify as "unlikely to be discovered" as a matter of law. *See Winograd*, 956 S.W.2d at 530–31; *Isaacs*, 356 S.W.3d at 560–62.

■ Given its governance structure, Energy Maintenance cannot avoid this result by asserting that Nesler controlled Energy Maintenance's defense in the *Sandt* litigation and kept the board in the dark. Energy Maintenance's company agreement placed the management of the company in the hands of its board of directors. The authority to indemnify in particular was vested in the board. Energy Maintenance's board, a supermajority of which was comprised of outside directors when it made the decision to indemnify Nesler, was obligated to conduct its own investigation into Sandt's allegations. *See Holloway*, 368 S.W.2d at 580. When a member of a Delaware limited liability company files suit alleging that the chief executive officer committed fraud and breach of fiduciary duty and that the company likewise is liable for his misconduct, the company's board owes a fiduciary duty to the company to investigate and monitor the litigation. *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 659–63 (Del. Ch. 2012); *Beam*, 833 A.2d at 971 & nn.16–17.

■ Energy Maintenance also relies on the summary-judgment affidavit of

Scott Zemnick, general counsel of the creditor that took control of the company in 2011. In his affidavit, Zemnick stated that Energy Maintenance learned of Nesler's lack of good faith as a result of an internal investigation made by new ownership that year. Zemnick further stated that he was unaware of any evidence indicating that an outside board member was aware of Nesler's wrongdoing before 2011.

Zemnick's affidavit does not alter the conclusion that the company was on notice of the claims it had against Nesler. First, the Texas Supreme Court's categorical approach to this inquiry does not turn on when Energy Maintenance actually discovered the particular injuries it alleges, but rather on the undisputed evidence that Energy Maintenance was a party to a lawsuit in which these allegations against it and Nesler were made. *See Wagner & Brown*, 58 S.W.3d at 735; *Apex Towing*, 41 S.W.3d at 122. Second, in its orders granting Nesler summary judgment on Energy Maintenance's claims for breach of fiduciary duty and fraud, the trial court sustained Nesler's objections to Zemnick's affidavit. On appeal, Energy Maintenance has not challenged these rulings.

The evidence shows Energy Maintenance was on inquiry notice of the allegations against Nesler. The nature of these allegations was detailed in publicly available court filings. The board was obligated to investigate Sandt's allegations when it became aware of them in August 2007, *see Valdez*, 465 S.W.3d at 231; *S.V.*, 933 S.W.2d at 8, and a rudimentary inquiry by the board would have divulged the nature of Nesler's alleged wrongdoing at that time. We therefore hold that Energy Maintenance's corresponding claims for fraud and breach of fiduciary duty against Nesler were not inherently undiscoverable. *See Winograd*, 956 S.W.2d at 530–31; *Isaacs*, 356 S.W.3d at 560–62. Because the discovery rule does not apply, the four-year statute of limitations bars Energy Maintenance's fraud and fiduciary duty claims. Accordingly, the trial court properly granted summary judgment in Nesler's favor on these claims.

## III. Settlement and release

Having determined that Energy Maintenance is obligated to indemnify Nesler from liability in the *Sandt* litigation, we turn to Energy Maintenance's suit against Sandt seeking a declaration of no liability pursuant to the parties' settlement agreement. Energy Maintenance maintains, and the trial court ruled, that Sandt agreed to forgo any collection of the judgment against Nesler for which Energy Maintenance would be liable. Sandt responds that the settlement agreement with Energy Maintenance allows him to collect the remaining $300,000 in exemplary damages that Nesler owes because Nesler was not a party to the settlement agreement.

## A. Standard of review and applicable law

■■■■ The settlement agreement between Sandt and Energy Maintenance provides that it shall be construed and enforced under Texas law. Under Texas law, we interpret settlement agreements like other contracts. *See McCoy v. Rogers*, 240 S.W.3d 267, 275–76 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

■■■■ Both Sandt and Energy Maintenance contend that the settlement agreement is unambiguous, and we agree. The interpretation of an unambiguous contract is a question of law, which we review de novo. *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 449 (Tex. 2015). The parties' intent, as expressed in the language of their contract, is controlling. *Plains Expl. & Prod. Co. v. Torch Energy Advisors*, 473 S.W.3d 296, 305 (Tex. 2015). Absent ambi-

guity, extrinsic evidence is inadmissible to show a meaning different from the plain language of the agreement. *Anglo–Dutch Petrol. Int'l v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011). We consider the contract's language as a whole, attempting to give effect to all of its terms so that none are rendered meaningless. *Seagull Energy E & P v. Eland Energy*, 207 S.W.3d 342, 345 (Tex. 2006). Thus, we do not read contractual provisions in isolation from one another. *In re Ford Motor Co.*, 211 S.W.3d 295, 298 (Tex. 2006) (per curiam). Nor do we consider terms that favor one party's interpretation of the contract and disregard the rest. *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005). Unless the contract shows that it uses a term in a technical or different sense, we accord the term its plain, ordinary, and generally accepted meaning. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

### B. The settlement agreement bars further collection efforts.

 In its final judgment, the trial court decreed that Sandt could not enforce the final judgment entered in the *Sandt* litigation against Nesler without breaching the Energy Maintenance/Sandt settlement agreement. The trial court reasoned that Energy Maintenance owed indemnity to Nesler, and thus an attempt to collect the remaining $300,000 Nesler owed under the *Sandt* judgment would violate the settlement agreement's clause barring Sandt from recovering any additional sum from Energy Maintenance "directly or indirectly." We conclude that the trial court correctly interpreted the settlement agreement.

According to Sandt, several of the settlement agreement's provisions show that he is not barred from trying to collect from Nesler. Sandt relies on:

- section 5(c), which states in part that the parties "expressly intend that nothing in this release will have any effect, in any way, on the Sandts' claims and causes of action against Tim Nesler";
- section 5(h), which states that the parties' mutual releases "are made on the express condition that they shall not operate to discharge any claims or defenses that the Parties had, now have, or may in the future have against Tim Nesler";
- section 6(d), which states in part that "nothing in this Agreement shall preclude or otherwise restrict the Sandts from seeking execution or recovery directly from Tim Nesler after all appeals are exhausted"; and
- section 9, which states in part that the agreement does not affect "in any way, any of the Parties' rights regarding Tim Nesler."

In relying on these provisions, Sandt observes that the settlement agreement does not condition his right to collect from Nesler on a ruling that Nesler is ineligible for indemnity from Energy Maintenance.

Sandt's interpretation of the agreement, however, fails to account for two provisions that have that effect. Under the settlement agreement, Energy Maintenance paid Sandt $1,450,000. Sandt released the company and its officers "from any and all claims, liabilities, actions, causes of action, demands, damages, payments, reimbursements, remedies or relief of any kind or nature." Section 6(d) of the settlement agreement provides that Sandt "will not seek to execute and will not accept recovery, in each case whether directly or indirectly, against" Energy Maintenance for any remaining liability arising from the suit. The lone circumstance in which Sandt could indirectly recover from Energy Maintenance notwithstanding this broad

release is if the company is obligated to indemnify Nesler, whom Sandt had not released from liability. Sandt's interpretation of the agreement, which would allow him to collect from Nesler despite Energy Maintenance's indemnity obligation, would impermissibly render the release from "indirect" recovery meaningless. *See Seagull Energy*, 207 S.W.3d at 345.

The settlement agreement's best-efforts clause also makes Sandt's interpretation untenable. Section 6(e) required Energy Maintenance to "use reasonable best efforts to challenge, including by engaging in litigation, arbitration or other process," any claim by Nesler that "he is entitled to indemnification from [Energy Maintenance] for any portion of liability included in the final and non-appealable judgment." If the agreement allowed Sandt to collect on the judgment against Nesler regardless of whether Nesler was entitled to indemnity from Energy Maintenance, then the provision requiring Energy Maintenance's cooperation in setting aside the indemnity would be rendered meaningless. Adopting Sandt's interpretation of the agreement would require us to read the provisions on which he relies in isolation, credit them alone, and discount the remainder of the agreement, which we cannot do. *See Ford Motor Co.*, 211 S.W.3d at 298; *Wilson*, 168 S.W.2d at 811. Considering the agreement's language as a whole, as we must, we conclude that the parties agreed that their settlement would not affect the liability of Nesler, a non-signatory whom Sandt had not released, with the exception that Sandt could not recover from Energy Maintenance—even indirectly—any more than the company already had paid him in settlement.

██ Sandt contends that additional documents filed in the *Sandt* litigation—a joint motion to release the appeal bond and his agreement to suspend enforcement of the judgment pending Nesler's appeal— show that the parties did not intend for his right to collect from Nesler to turn on Nesler's right to indemnity from Energy Maintenance. Unlike several other documents, however, the ones relied on by Sandt were not annexed to the settlement agreement, which contains an integration clause disavowing any understandings other than those specifically set forth in the agreement. As extrinsic evidence, these additional documents are not admissible to contradict the settlement agreement's unambiguous terms. *See Anglo–Dutch Petrol. Int'l*, 352 S.W.3d at 451.

In sum, the settlement agreement bars Sandt from recovering from Nesler because it would result in an indirect recovery from Energy Maintenance, which is obligated to indemnify Nesler for the *Sandt* judgment. We hold that the trial court properly interpreted the settlement agreement.

## CONCLUSION

We affirm the judgment of the trial court.